IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
EASTERN DIVISION

SERFIN AMOS,

     Plaintiff,

v.                                No. 11-1314

McNAIRY COUNTY, TENNESSEE and
McNAIRY COUNTY SHERIFF'S DEPARTMENT,

     Defendants.

_____

ORDER GRANTING IN PART AND DENYING IN PART
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
_____

*INTRODUCTION AND PROCEDURAL HISTORY*

In this matter, initiated on October 18, 2011, the Plaintiff, Serfin Amos, has alleged

violations by the Defendants, McNairy County, Tennessee (the "County") and the McNairy County

Sheriff's Department (the "Sheriff's Department"), of Title VII of the Civil Rights Act of 1964, 42

U.S.C. § 2000e, *et seq.;* the Tennessee Human Rights Act, Tennessee Code Annotated § 4-21-101,

*et seq.*; and the Tennessee Public Protection Act, Tennessee Code Annotated § 50-1-304. On March

12, 2012, the case was consolidated with Amos v. McNairy County, Tennessee, et al., No. 12-1047

(W.D. Tenn.). In an order entered June 29, 2012, the Court dismissed Plaintiff's claims against the

Sheriff's Department. (D.E. 40.) Before the Court is the County's motion for summary judgment

pursuant to Rule 56 of the Federal Rules of Civil Procedure.

*STANDARD OF REVIEW*

Rule 56 provides in pertinent part that "[t]he court shall grant summary judgment if the

movant shows that there is no genuine dispute as to any material fact and the movant is entitled to

judgment as a matter of law." Fed. R. Civ. P. 56(a). "To survive summary judgment, the nonmoving party must come forward with specific facts showing that there is a genuine issue for trial." <u>Pucci v. Nineteenth Dist. Ct.</u>, 628 F.3d 752, 759-60 (6th Cir. 2010) (citing <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986)) (internal quotation marks omitted). "A genuine issue of material fact exists if a reasonable juror could return a verdict for the nonmoving party." <u>Id.</u> at 759 (citing <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." <u>Bobo v. United Parcel Serv., Inc.</u>, 665 F.3d 741, 748 (6th Cir. 2012) (quoting <u>Anderson</u>, 477 U.S. at 255, 106 S. Ct. 2505). "Entry of summary judgment is appropriate against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." <u>In re Morris</u>, 260 F.3d 654, 665 (6th Cir. 2001) (quoting <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)) (internal quotation marks omitted).

*FACTS*

The following facts are undisputed unless otherwise noted. Amos, a black male, was an at-will employee of the County who worked at the Sheriff's Department as a correctional officer from 2008 until his termination on June 6, 2011. At the time of his application, the County ran a background check on him through the National Crime Information Center (NCIC) database.[1] (D.E. 128-2.) The NCIC report reflected arrests and/or charges against Plaintiff in April 1990, November

---

[1]NCIC is a "national computerized data bank operated by the Federal Bureau of Investigation [(FBI)] and designed to assist federal, state, and local law enforcement agencies." <u>Baker v. McCollan</u>, 443 U.S. 137, 155 n.17, 99 S. Ct. 2689, 2700 n.17, 61 L. Ed. 2d 433 (1979).

1993 and November 1997.  (<u>Id.</u>)

According to Amos, at some point during the tenure of Rick Roten as sheriff of McNairy County, Plaintiff alleged that he expressed his interest in becoming a deputy.  In his deposition, Roten could not recall such a request, but testified that he did not believe Plaintiff would have been able to do the job.  (D.E. 127-5 at 29-30.)  He explained that he did not "feel like he was deputy material," although he could not articulate a reason for his belief.  (<u>Id.</u> at 30.)  Amos did not become a deputy sheriff.  In his deposition, Amos also claimed that he spoke to Roten about a job as a bailiff.  (D.E. 126 at 19-20.)  Plaintiff was never moved to a bailiff position under Roten.

In early 2010, the Plaintiff was assigned by Roten to supervise a crew of inmates who picked up litter along roadsides in McNairy County.  (D.E. 128-5.)  On April 14, 2010, Amos took a day off for a doctor's appointment.  (D.E. 128-6.)  Corrections officer Brian Huggins, who is white, filled in as the crew's guard in his absence.  (D.E. 67 ¶ 5.)  The following day, Amos was issued a Disciplinary Action form in which he was removed from overseeing the litter crew, reassigned to the jail and placed on sixty days probation for nonperformance on the litter crew.  (D.E. 128-7.)  On the form, Roten wrote "if any problems he could be dismissed."  (<u>Id.</u>)  According to the sheriff, he had heard from trustees at the jail that Amos required the crew to pick up trash only a couple of hours per day and permitted them to fish or sleep the rest of the time.  (D.E. 67 ¶ 4.)  Roten also stated in his declaration that, while Huggins was present, much more trash was collected.  (<u>Id.</u> ¶ 6.)  After Plaintiff's assignment to the jail, Huggins took over his duties with the litter crew.  (D.E. 128-5.)

On May 27, 2010, Amos filed a charge of discrimination based on race with the Equal Employment Opportunity Commission (EEOC) as a result of his reassignment from the litter crew

to the jail. (D.E. 128-9 at 1.) The agency submitted questions to the Defendant with respect to the charge, which were responded to on July 8, 2010. (D.E. 128-11.)

Guy Buck began serving as sheriff of McNairy County on September 1, 2010. (D.E. 126-2 at 2.) Subsequently, Plaintiff submitted a handwritten letter to Buck conveying his interest in a court security position.[2] (D.E. 128-12.) He did not receive that appointment.

The EEOC issued a letter to the County's attorney on April 26, 2011 advising of its plan to conduct an onsite investigation concerning Amos's charge. (D.E. 128-13.) The agency instructed that Huggins and another employee be available for interviews.[3] (Id.) The onsite investigation occurred as scheduled.

In May 2011 while on duty as a corrections officer, Amos witnessed an officer from another jurisdiction abusing a prisoner as he was being brought into the McNairy County Jail for booking. (D.E. 126 at 44-49.) He and others later offered testimony to state and/or federal authorities as part of an investigation into the incident. (Id. at 50-51.)

According to Sheriff Buck, in late 2010 and early 2011, his administration began reviewing all employee personnel files and discovered that many lacked critical documentation required by the State of Tennessee. (D.E. 126-2 at 5.) For example, Tennessee Code Annotated § 41-4-144 mandates that "any person employed as a . . . jailer, corrections officer or guard in a county jail . . . . shall

[n]ot have been convicted of, or pleaded guilty to, or entered a plea of nolo

---

[2]The letter is undated. (D.E. 128-12.)

[3]The other employee was Stephanie Cooper (Wilson), a chief jailer for the first shift who Amos listed on the EEOC intake questionnaire as a witness to the discriminatory incidents identified in the charge. (D.E. 128-9 at 5, D.E. 128-13, D.E. 127-7 at 2.)

contendere to any felony charge or to any violation of any federal or state laws or municipal ordinances relating to force, violence, theft, dishonesty, gambling, liquor, controlled substances or controlled substance analogues; [and]

[n]ot have been released or discharged under any other than honorable discharge from any of the armed forces of the United States; . . .

Tenn. Code Ann. § 41-4-144(a)(4)-(5).

Buck stated in his deposition that employees whose files were incomplete were so advised and given a time period in which to cure the deficiencies. (D.E. 126-2 at 5-6.) On April 28, 2011, an entry in a Sheriff's Department logbook or passbook noted that personnel information was needed from four corrections officers, one of whom was Amos. (D.E. 128-14 at 1.) The missing items listed included a diploma and a DD214, which, according to Buck, was a military discharge form. (Id., D.E. 126-2 at 6.)

The sheriff related that searches were conducted on all employees, including Amos and himself, using TLO.com, an internet investigative tool marketed to law enforcement agencies to which McNairy County had a free trial subscription, to screen current employees and to test the effectiveness of the service. (D.E. 126-2 at 3-4, 16-18.) According to Allen Strickland, who served as jail administrator for a time under Buck, TLO.com searches produced more information than those generated by NCIC, including previous addresses, vehicles owned, people with whom the target may have associated, and criminal charges not entered into the NCIC database. (D.E. 127-6 at 5, 9.) The Plaintiff vigorously disputes that TLO.com background searches were performed on all employees. On May 20, 2011, the sheriff sent a fax to the Phoenix, Arizona Municipal Court requesting a copy of a warrant issued with respect to Plaintiff that showed up on the TLO.com

report.[4] (D.E. 131-2.)  The same day, Operational Jail Supervisor Clint Rajaniemi issued two letters,

on Sheriff's Department letterhead, to Plaintiff.  The first stated as follows:

> This is a formal request of your DD214 discharge paperwork from the U.S. Air
> Force.  We are requesting this for your personnel file and to keep us in accordance
> with Tennessee Code Annotated, Title 41, Chapter 4, Section 41-4-143.  You have
> 7 business days to produce said form, or you will be taken off the schedule without
> compensation[5] until it is provided.  Thank you for your cooperation in resolving this
> matter.

(D.E. 131-3.)  Rajaniemi advised in the second that:

> [u]pon reviewing Senate Bill NO. 3189 Tennessee Code Annotated 41-4-143(a)(4)
> a criminal background check was performed on all current jail employees.  During
> the background check, an active warrant was found out of the Phoenix Municipal
> Court in Phoenix, AZ.  The case number is #1801251 which is a failure to appear on
> criminal trespass and false imprisonment.  Due to this active warrant, you are being
> placed on administrative leave pending an official disposition from the Phoenix
> Municipal Court.

(D.E. 131-4.)[6]  No other Sheriff's Department employees received such letters.  (D.E. 126-2 at 30.)

Amos was fired seventeen days later.  (D.E. 125-1.)  According to his separation notice, the

reason for the discharge was that he "did not meet pre-employment requirement:  criminal history --

military discharge."  (Id.)

---

[4]This warrant had not been revealed in the NCIC search performed by the County at the
time of Amos's hire.

[5]Apparently, Plaintiff utilized accumulated comp and vacation time in order to continue
receiving pay during the period of administrative leave.  (D.E. 120-2 ¶ 16.)

[6]The letters' references to § 41-4-143 appear to be in error.  The cited section reads:  "The
sheriff shall within thirty (30) days report to the county legislative body and to the department of
correction the name of any prisoner who escapes while serving on a work detail and shall
indicate whether the work detail on which the prisoner was serving was supervised or
unsupervised."  The Court assumes Rajaniemi intended to cite to § 41-4-144.

*ASSERTIONS OF THE PARTIES AND ANALYSIS*

Federal Claims.

*Claims under 42 U.S.C. § 1983*

In its dispositive motion, the Defendant seeks dismissal of Plaintiff's claims under § 1983, which were included in his original complaint filed October 18, 2011 but not his first amended complaint proffered to the Court on February 7, 2012. A review of the docket indicates that the first amended complaint was never actually filed, even though the Court granted leave for such filing on February 22, 2012. (D.E. 28.) The Court DIRECTS the Clerk to enter the first amended complaint on the docket as of the date leave therefor was granted. The amended complaint supercedes the original complaint and controls the case thereafter. *See* Parry v. Mohawk Motors of Mich., Inc., 236 F.3d 299, 306-07 (6th Cir. 2000), *cert. denied*, 533 U.S. 951, 121 S. Ct. 2594, 150 L. Ed. 2d 752 (2001). Thus, there is no longer a § 1983 claim.

*Title VII*

The Statute Generally.

Title VII prohibits an employer from "discriminat[ing] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race . . ." 42 U.S.C. § 2000e-2(a)(1). A discrimination claim may be proven using either direct or circumstantial evidence. Kuhn v. Washtenaw Cnty., 709 F.3d 612, 624 (6th Cir. 2013). "Direct evidence is proof that, if believed, compels the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions." Id. (internal quotation marks omitted). In the absence of direct evidence, courts are directed to utilize the familiar burden-shifting analysis

articulated in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668

(1973). <u>Davis v. Cintas Corp.</u>, 717 F.3d 476, 491 (6th Cir. 2013), *reh'g & reh'g en banc denied*

(Aug. 7, 2013). State law claims under the THRA are also analyzed using this framework. <u>Hillman</u>

<u>v. Shelby Cnty.</u>, 515 F. App'x 365, 369 (6th Cir. 2013).

A plaintiff relying only on circumstantial evidence, such as Amos, must first make out a

prima facie case of discrimination. <u>Davis</u>, 717 F.3d at 491. "If [he] meets this requirement, [the

defendant] must offer some legitimate, nondiscriminatory explanation for its employment decision.

If the company produces such an explanation, [the plaintiff] must point out evidence from which a

jury could reasonably reject [the employer's] explanation." <u>Id.</u> (internal citation & quotation marks

omitted). "[The plaintiff] bears this third burden, even when opposing a motion for summary

judgment. [He] must, therefore, point to evidence that, taken in a light most favorably to [him],

could lead a reasonable jury to reject [the employer's] proffered explanations." <u>Id.</u> (internal citation

omitted).

<u>Race Discrimination.</u>

*Wage Discrimination Based on Race.*

Amos claims that the Defendant discriminated against him on the basis of race by paying him

less than white employees.[7] "The [United States] Supreme Court has held that pay disparities

---

[7]     At this point, the Court finds it necessary to point out what it considers a mischaracterization of the evidence by Plaintiff's counsel. According to Amos's deposition, in the spring of 2010 a co-worker showed him a document reflecting the salaries of Sheriff's Department employees. (D.E. 126 at 2.) He stated therein that, upon his review, he "noticed that there were numerous employees that were making more than I was even though they have been there less time." (<u>Id.</u>) In his statement of material facts, Amos posits in paragraph 9 thereof that

> [i]n the Spring of 2010, Julie Lepford showed Serfin Amos payroll records which
> indicated that African American employees of the McNairy County Sheriff's

8

between a black employee and a similarly situated white employee can serve as the basis for a lawsuit under Title VII." <u>Moore v. Univ. of Memphis</u>, No. 10-2933-AJT-TMP, 2013 WL 6550434, at *13 (W.D. Tenn. Aug. 16, 2013), *report & recommendation adopted by* 2013 WL 6538391 (W.D. Tenn. Dec. 13, 2013). To demonstrate a prima facie case of discrimination based on circumstantial evidence, Amos must show that "(1) he was a member of a protected class; (2) he suffered an adverse employment action; (3) he was otherwise qualified for the position; and (4) he was replaced by someone outside the protected class or treated differently from a similarly situated, non-protected employee." <u>Deleon v. Kalamazoo Cnty. Rd. Comm'n</u>, ___ F.3d ___, 2014 WL 114016, at *2 (6th Cir. Jan 14, 2014).

In support of this claim, Plaintiff points to the report of his expert, Dr. Parker Cashdollar. The report notes that six corrections officers were hired by the County in 2008. Kiley McFall, a white male hired a few months prior to Plaintiff was, according to the report, paid at essentially the same rate as Amos. (D.E. 131-11 at 4.) Danny Pinson, a white male hired three weeks after Amos,

---

Department were paid less than Caucasians working in the same jobs. Serfin Amos complained to his supervisors, the Sheriff and to the County Mayor regarding this inequity.

(D.E. 128 at 3-4.) Plaintiff cited to pages 12, 178 and 209-10 of his deposition as support for this assertion. (<u>Id.</u>) Amos's counsel gives the impression in paragraph 9 that Plaintiff believed the pay differentials were based on race. However, the cited pages reflect that Amos was concerned that other employees less senior than he were paid more. (D.E. 126 at 2 (Amos Dep. p. 12).) He did not testify that he believed upon reviewing the document that blacks made less than whites. Moreover, he testified that he spoke to the mayor "about getting [his] pay adjusted to a level with other correctional officers at the time or service [sic]" and that he complained "about not getting the proper amount of pay." (<u>Id.</u> at 23 (Amos Dep. p. 178).) Amos reported that he also talked to the sheriff, who told him he would "look into it." (<u>Id.</u> at 43 (Amos Dep. at 210).) Nowhere in the cited pages did Amos testify that he told the sheriff, the mayor, or anyone else that he believed blacks were paid less than whites or that any alleged wage disparity was the result of race discrimination.

was paid $16,002 more than Plaintiff over a period of three years.  (Id. at 7.)  Douglas Popadines, a white male hired two weeks before Amos, was paid $1,183 more than Plaintiff over the same period.  (Id. at 8.) Jon Dunn, a black male who began working for the County at about the same time as Amos, was paid at essentially the same rate as Plaintiff.  (Id. at 4.)  Cassandra Atkins, a black female, earned slightly less than Amos, Dunn and McFall.  (Id.).  Cashdollar proffered no opinion as to whether Amos was not paid properly while employed by the County, but opined that the information he provided might be "useful in determining damages."  (Id.)

A plaintiff must show "that he and his proposed comparators were similar in all relevant respects[.]"  Bobo, 665 F.3d at 751.  "Differences in job title, responsibilities, experience, and work record can be used to determine whether two employees are similarly situated."  Leadbetter v. Gilley, 385 F.3d 683, 691 (6th Cir. 2004), *reh'g en banc denied* (Jan. 18, 2005).  Relevant factors also include the comparator's skill and effort in performing his duties.  Mickey v. Zeidler Tool & Die Co., 516 F.3d 516, 522 (6th Cir. 2008).  The Plaintiff has pointed to no evidence relative to Pinson or Popadines beyond their hire dates and the amount of money they made -- not their education, experience, duties, skills or the hours they worked.  Nor has Amos offered any insight into why McFall, who was white, was paid the same as he and Dunn.  Viewing the report in the light most favorable to the Plaintiff, the Court finds that he has failed to create a permissible inference that Pinson and Popadines were similarly situated.[8] [9]  *See* Hicks v. Concorde Career Coll., 695 F.

---

[8]The exhibits filed in this case are quite voluminous.  Plaintiff's counsel is reminded that the Court "is not obligated to wade through and search the entire record for some specific facts that might support [his] claims."  Occhione v. PSA Airlines, Inc., 886 F. Supp. 2d 736, 744 (S.D. Ohio 2012) (internal quotation marks omitted).

[9]The Court recognizes that the Sixth Circuit held in Birch v. Cuyahoga County Probate Court, 392 F.3d 151 (6th Cir. 2004) that a plaintiff suing for wage discrimination is not required

Supp. 2d 779, 793 (W.D. Tenn. 2010) (due to plaintiff's failure to demonstrate his comparators were similarly situated, summary judgment in favor of defendant was appropriate), *aff'd* 449 F. App'x 484 (6th Cir. 2011); *see also* Lacey v. Robertson, No. 99-1424, 2000 WL 876491, at *2-3 (6th Cir. June 21, 2000) (where plaintiff in race-based wage discrimination case could not demonstrate a prima facie case, summary judgment warranted). The wage discrimination claim based on race is DISMISSED.

*Race Discrimination Based on Alleged Demotion to Jailer.*

Amos contends that his reassignment from the litter crew to the jail, where he worked Friday through Sunday, was based on racial animus.[10] As previously noted herein, a plaintiff asserting a race discrimination claim must demonstrate that he suffered an adverse employment action. *See* Deleon, 2014 WL 114016, at *2. The County submits that Roten's action was not "adverse."

"An adverse employment action has been defined as a materially adverse change in the terms and conditions of a plaintiff's employment." Id. at *3 (citing White v. Burlington N. & Santa Fe Ry. Co., 364 F.3d 789, 795 (6th Cir. 2004) (en banc)) (internal quotation marks omitted). "A mere inconvenience or an alteration in job responsibilities is not enough to constitute an adverse

---

[10]It is Amos's assertion that another employee who is a member of a non-protected class performed equal work for greater pay "when there is other highly probative evidence that [his] salary would have been higher but for" his race. *See* Birch, 392 F.3d at 163; *see also* Balding-Margolis v. Cleveland Arcade, 352 F. App'x 35, 43 (6th Cir. 2009). In doing so, the court observed that "there may be cases where there is so much evidence of a decision-maker's discriminatory animus that a plaintiff's failure to satisfy the fourth element of the McDonnell Douglas prima facie case is not fatal to [his] claim." Birch, 392 F.3d at 166. In this case, there is no such evidence of discriminatory animus with respect to pay.

[10]It is Amos's assertion that he was originally told he would swap jobs with Huggins, who worked a regular twelve-hour shift, but was later informed that he would be transferred to a weekend position. (D.E. 126 at 39-42.)

employment action." Id. (citing White, 364 F.3d at 797) (internal quotation marks omitted). While "reassignments without changes in salary, benefits, title, or work hours usually do not constitute adverse employment actions," a "reassignment without salary or work hour changes . . . may be an adverse employment action if it constitutes a demotion evidenced by a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation." Id. (internal citation & quotation marks omitted). "[W]hether a particular reassignment is materially adverse depends upon the circumstances of the particular case[] and should be judged from the perspective of a reasonable person in the plaintiff's position, considering all the circumstances." Id. (citing Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 71, 126 S. Ct. 2405, 165 L. Ed. 2d 345 (2006)) (internal quotation marks omitted). "At a minimum, the employee must be able to show a quantitative or qualitative change in the terms of the conditions of employment," that is, "some level of objective intolerability." Id. at *4.

In his deposition, Roten described the weekend jailer position to which Amos was reassigned thusly:

> [W]e needed somebody to work a shift where we had a week of people coming into the jail serving weekends. And I believe we put him doing that. I mean, you have to search everybody that comes in, dress them out, you know, make sure they're not bringing contraband in, that type of thing. And we needed somebody to help do that because there was numbers of them coming in at some time and he would come in. And he -- I think he came -- I think he came back doing that . . . And then he would cover -- I believe he would cover some people on vacation and things like that . . . [W]e would search every one of them. Sometimes it would -- when it was a lot of them, it would take more than one correctional officer.

(D.E. 127-5 at 10-12.)

The County asserts that, as a salaried employee, Plaintiff's reassignment did not affect his rate of pay or salary. (D.E. 65-4 ¶ 7.) There is no evidence that his hours or benefits were cut, that

he had a less distinguished title, or that he had diminished material responsibilities.[11]  While there is no indication that he was paid less in the weekend jailer position, he argues that, because it was an undesirable position, the fact that he was not offered more money for performing that job amounted to a decrease in salary.  He claims the assignment was a "serious punishment," "the last step before termination," and the "most undesirable job at the jail," citing Roten's deposition testimony at pages 60 and 61.  (D.E. 128 ¶ 11, D.E. 120 at 7.)  However, Plaintiff's counsel again mischaracterizes the evidence.  As outlined in the "Facts" section above, the Disciplinary Action form completed by Roten on April 15, 2010 reflected that Plaintiff was to be taken off the litter crew, assigned to the jail and placed on sixty days probation.  (D.E. 128-7.)  In Roten's deposition at the cited pages, the following testimony was adduced by Plaintiff's counsel:

> Q:      Well, you would -- you would agree with me that putting somebody on probation, writing them up and telling him he can be dismissed for any other problems is a fairly serious form of discipline, I mean, it's the last step before termination, isn't it?
>
> *      *      *
>
> A:      Oh, yes, it is serious.

(D.E. 127-5 at 24 (Ricky Roten Dep. at 60).)  Thus, Roten's statement in fact offers no support for the assertion that the *reassignment* was adverse.

Plaintiff also cites to Huggins's response to questions posed by the EEOC, in which he stated that "I asked to go on the litter crew and I enjoyed being on the outside and it was a peaceful break" (D.E. 128-8 at 2) and to his deposition, where the following testimony was given:

> Q:      Is [working on the litter crew] a better schedule than working 12-hour shifts at the jail?

---

[11]Indeed, it appears the jailer position may have involved more material responsibilities.

13

*    *    *

A:    Yes, sir.

Q:    I've been told that you enjoy being outside and doing the litter detail better than doing jail work?

A:    Yes, sir.

Q:    Okay.  I -- I think I understand that, but I want to hear what you think about that.  Tell me why you like that better.

A:    Less stressful.

Q:    And again, I think I know what you mean, but I don't want to assume that.  What -- why is that less stressful?

A:    Less inmates to keep up with taking care of.

(D.E. 126-4 at 2 (Brian Huggins Dep. at 19).)   Amos referenced other deposition testimony, including that of fellow corrections officer Stephanie Wilson,[12] who testified that Huggins told her "he was so happy to be out of the jail."  (D.E. 127-7 at 3 (Stephanie Wilson Dep. at 25).)  He also pointed to Roten's statement in his deposition that Huggins expressed an interest in the litter crew assignment because "he just wanted to get outside, I think."  (D.E. 127-5 at 9-10 (Rick Roten Dep. at 41-42).)  Although Huggins may have thought so, Plaintiff has offered no evidence to suggest that an objectively reasonable person in his position would have preferred picking up trash outdoors in all weathers over working indoors or that Sheriff's Department employees perceived the litter crew to be more desirable.  Nor has he cited to precedent holding that transfer from an outdoor job to an indoor position is adverse.  Merely subjective preferences do not rise to the level of an adverse employment action.  Malozienc v. Pacific Rail Servs., 606 F. Supp. 2d 837, 866-67 (N.D. Ill. 2009).

---

[12]Stephanie Wilson and Stephanie Cooper appear to be the same person.

The Plaintiff argues in his response to the instant motion that the "County knew this was a very unsatisfactory transfer for Amos because Amos had continually told the County how important it was for him to be able to attend church services on the weekends." (D.E. 120 at 7.) In support of his assertion, the Plaintiff points to Roten's statement to the EEOC on July 8, 2010 and to his own deposition at pages 206 and 207. In what has become an unfortunate pattern in responding to the motion, the portions of the record cited by Amos's counsel do not say what they are claimed to say. Nowhere in either Roten's EEOC statement or the cited pages of Amos's deposition is there any mention of church or of a complaint by the Plaintiff about working weekends, for any reason.[13] (D.E. 126 at 39-41 (Serfin Amos Dep. at 206-07).)

Amos also relies on pages 206 and 207 of his deposition for his assertion that the reassignment was unsatisfactory for him "because it meant he was no longer eligible to accumulate comp time and because he would be basically on call at a moment's notice." (D.E. 120 at 7.) Again, there is no mention of either on the cited pages. Amos is correct, however, that in the portion of the record referred to he testified that he was told if he was called in to cover for someone and failed to show up, he would be fired. (D.E. 126 at 40 (Serfin Amos Dep. at 207).) He points to no caselaw, and the Court is aware of none, holding that an employer's threat to fire an employee if he fails to perform his duties constitutes an adverse employment action.

---

[13]The Court notes, however, that there is evidence in the record Amos told *Sheriff Buck*, who was of course not the sheriff when the reassignment occurred, at some point that he wanted to attend church on the weekends. (*See* D.E. 131-8 at 2.) Buck stated in response to an inquiry from the EEOC that the Sheriff's Department discontinued the every weekend shift worked by Amos and converted him to a twelve-hour shift in which he was off every other weekend. (Id.) According to Buck, when the weekend shift ended, Plaintiff did not ask to return to the litter crew. (Id.) Amos did not cite to this statement in support of his apparent assertion that the County was aware *prior to his reassignment* to the weekend position that he wanted to attend church on the weekends.

Finally, he cites to page 208 of his deposition for the contention that the weekend schedule was referred to by County employees as the "hardship" schedule, meaning that "it was a shift employees were put on if the [Sheriff's] Department was seeking to 'wear . . . down' an employee or cause the employee to resign." (D.E. 120-2 ¶ 6.) This is an exaggeration of the testimony, which reads in pertinent part as follows:

Q: . . . [W]as there any change as to your employment other than you being on probation again for 60 days?

A: Yeah, I was put on a hardship schedule.

Q: What do you mean by that?

A: Huh?

Q: What do you mean by that, I'm sorry?

A: That's what's known as a shift you're put on if they're trying to make you quit or wear you down.

Q: Who told you that?

A: That's my -- me.

Q: That's just you?

A: Uh-huh (affirmative response).

Q: Are there not people who want to work the Friday, Saturday and Sunday shift?

A: Constantly, no.

Q: Well, I'm talking about are there people that want to work that shift?

\*       \*       \*

A: Not to my knowledge, no.

(D.E. 126 at 40-41 (Serfin Amos Dep. at 207-08).)

The Plaintiff has provided to the Court no precedent holding that a schedule requiring an employee to work a weekend shift constitutes an adverse employment action. Indeed, courts in this Circuit have found otherwise. *See* Sams v. Northcoast Behavioral Health Care Ctr., No. 5:06CV3040, 2007 WL 4300118, at *11 (N.D. Ohio Dec. 5, 2007) ("a shift reassignment in and of itself does not constitute an adverse employment action when it does not result in a materially adverse change in the terms and conditions of employment, including termination, demotion with decreased wages, loss of salary or loss of benefits"); Clay v. United Parcel Serv., Inc., No. 5:04-CV-1262, 2005 WL 1540224, at *17 (N.D. Ohio June 30, 2005) (a shift change without material change in salary not adverse employment action), *rev'd in part on other grounds* 501 F.3d 695 (6th Cir. 2007). In short, the Plaintiff has failed to establish the existence of a genuine issue of material fact as to whether his reassignment to the weekend jailer position was objectively intolerable. The claim is DISMISSED.

*Race Discrimination Based on Probation.*

Amos next avers that he suffered race discrimination in being placed on probation for not adequately performing his duties as guard over the litter crew. Again, Plaintiff has failed to establish that the probation constituted an adverse employment action, as he has made no showing of diminished responsibilities, benefits or pay. *See* Craig-Wood v. Time Warner N.Y. Cable LLC, No. 2:10-cv-906, 2012 WL 3929819, at *8 (S.D. Ohio Sept. 10, 2012) (six-month disciplinary probation not adverse absent diminished job responsibilities, title or compensation); Mawaldi v. St. Elizabeth Health Ctr., 381 F. Supp. 2d 675, 686-87 (N.D. Ohio 2005) (academic probation not adverse, even though plaintiff was informed that he might be dismissed if he failed to perform and was closely monitored); *cf.* Alexander v. Univ. of Ky., No. 5:10-CV-48-REW, 2012 WL 1068764, at *12 (E.D.

17

Ky. Mar. 28, 2012) (imposition of probation constituted adverse employment action where coupled with loss of benefits). The discrimination claim arising from the imposition of probation by Sheriff Roten is DISMISSED.

*Race Discrimination Based on Failure to Promote.*

> To establish a prima facie case of racial discrimination on a failure to promote claim, [a plaintiff] must establish that: (1) he is a member of a protected class; (2) he applied and was qualified for a promotion; (3) he was considered for and denied the promotion; and (4) other employees of similar qualifications who were not members of the protected class received promotions.

Nicholson v. City of Clarksville, 530 F. App'x 434, 444-45 (6th Cir. 2013). Amos alleges that he requested a promotion to deputy and transfer to a courtroom bailiff position but was denied both, he claims, on the basis of race.

Plaintiff identifies two white employees -- Pinson and Jason Gray -- who were promoted by Roten to deputy positions. The sheriff testified in his deposition that Gray started out at the jail and that he "made him a road deputy later on," but did not say when. (D.E. 127-5 at 27.) As for Pinson, he advised that "When I hired Danny, I hired him in the jail. I didn't have an opening. And he was commissioned, and when I got an opening on the road, I put him on the road." (Id. at 28.)

There are two problems with Amos's claim. First, it is unclear when the other officers' promotions occurred -- whether before or after Amos asked for a promotion, or, for that matter, when Plaintiff's request took place. Thus, it is unknown to the Court whether there was actually an open deputy position at the time of the request. "A failure-to-promote claim requires an open position." Johnson v. Cargill, Inc., 932 F. Supp. 2d 872, 887 (W.D. Tenn. 2013.) Secondly, Plaintiff has offered no evidence that he had the same qualifications as Gray and Pinson, other than that they were corrections officers prior to their promotions.

With respect to the court security/bailiff job, Amos testified in his deposition that Sheriff Roten called him into the courtroom one day and said he "was thinking about moving [Amos] up to court bailiff.[14] And I told him I -- I would be happy with that." (D.E. 126 at 20.) Buck explained in his deposition as follows:

> One of the ideas that I had when I took office was that if the opportunity presented itself, we would like to take motivated employees from the jail, cross-train them into a bailiff position basically as a precursor to maybe becoming a road deputy. We had seen them as a jail employee, if we cross-trained them as a bailiff or court security, then maybe we could find out how they interacted more with the regular public and just see – you know, just another opportunity to look at them in a different light while still maintaining their status as a correction officer.

(D.E. 126-2 at 33.) Plaintiff maintains that he sought the bailiff position because of its identification by the sheriff as a precursor to the deputy job due to its cross-training for deputy duties. However, Buck stated in his deposition that "we never did it." (Id. at 44.) Amos does not dispute the sheriff's statement. Thus, even if a transfer to bailiff could be considered a promotion for Title VII purposes, there is no proof that the cross-training that formed the basis for Amos's request for the position was ever made available to anyone, black or white. In addition, Amos does not dispute Buck's declaration statement that there were no openings for court security officers at the time of Plaintiffs' request. (D.E. 65-3 ¶ 8.) *See* Johnson, 932 F. Supp. 2d at 887. Similarly, there is no evidence an opening for a bailiff existed when Amos requested the position of Roten. *See* id. The failure to promote claims are DISMISSED.

Retaliation.

Title VII also prohibits employers from "discriminat[ing] against any individual . . . because

_____

[14]It is somewhat unclear whether Amos requested a transfer to court security/bailiff under both sheriffs. For purposes of this order, the Court will assume he did.

he has opposed any practice made an unlawful employment practice by [the statute], or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [the statute]." 42 U.S.C. § 2000e-3(a). The prima facie case is established by showing that (1) the plaintiff "engaged in a protected activity under Title VII"; (2) plaintiff's "protected activity was known to" the employer; (3) the defendant took adverse employment action against the plaintiff; and (4) "there was a causal connection between the adverse employment action and the protected activity." Nicholson, 530 F. App'x at 446. "Title VII retaliation claims require proof that the desire to retaliate was the but-for cause of the challenged employment action." Univ. of Tex. Sw. Med. Ctr. v. Nassar, ___ U.S. ___, 133 S. Ct. 2517, 2528, 186 L. Ed. 2d 503 (2013). Stated differently, Title VII "requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." Id. at 2533. "At the prima facie stage of the litigation, . . . the burden upon the plaintiff is minimal. . . . All that is required of plaintiff at the prima facie stage is to demonstrate that [he] has a case, that the evidence is on [his] side." Brown v. Lexington-Fayette Urban Gov't, 483 F. App'x 221, 225 (6th Cir. 2012) (internal citations, alterations & quotation marks omitted).

Filing an EEOC charge constitutes protected activity. Strouss v. Mich. Dep't of Corr., 250 F.3d 336, 342 (6th Cir. 2001). It is undisputed that the Defendant was aware of the EEOC filing. Termination qualifies as an adverse employment action. Latowski v. Northwoods Nursing Ctr., ___ F. App'x ___, 2013 WL 6727331, at *4 (6th Cir. Dec. 23, 2013). Therefore, the Plaintiff has demonstrated the first three elements of the prima facie case.

Disagreement between the parties focuses on the fourth element -- causation. Defendant argues that Plaintiff has failed to establish a causal connection between his termination and the

EEOC charge.  In addition to the undisputed facts set forth above, Amos submits the deposition testimony of Strickland, who stated that all the searches using the TLO.com service were completed on the same day -- presumably the day after the EEOC inspection -- and that Plaintiff's background search was done by Buck personally.  (D.E. 127-6 at 4, 6.)  He also recalled that Plaintiff's background report was the only one printed.  (Id. at 5-6.)

"Where an adverse employment action occurs very close in time after an employer learns of a protected activity, such temporal proximity alone may satisfy the causal prong of a plaintiff's prima facie retaliation case."  Herrera v. Churchill McGee, LLC, ___ F. App'x ___, 2013 WL 6126150, at *3 (6th Cir. Nov. 21, 2013) (quoting Mickey, 516 F.3d at 523-25).  "In those 'limited' and 'rare' cases, [the court] can infer a causal connection between the two actions without other evidence of retaliation."  Id.  Viewing the evidence in the light most favorable to the Plaintiff, the Court finds that his firing seventeen days after the EEOC onsite investigation arising from his discrimination charge satisfies the causation prong of the prima facie case.  See id. (plaintiff's firing a month after protected activity satisfied causation element); Dye v. Office of the Racing Comm'n, 702 F.3d 286, 306 (6th Cir. 2012) (a lapse of two months between protected activity and adverse action is sufficient to show a causal connection), reh'g & reh'g en banc denied (Mar. 19, 2013).

A retaliation claim is analyzed using the same McDonnell Douglas burden-shifting paradigm applied to discrimination claims.  Fuhr v. Hazel Park Sch. Dist., 710 F.3d 668, 673-74 (6th Cir. 2013), reh'g denied (Apr. 12, 2013); see also Nicholson, 530 F.App'x at 446-47.  That is, upon demonstration of a prima facie case of retaliation, "a presumption of unlawful retaliation arises and the burden of production shifts to the defendant to rebut the presumption by articulating some legitimate, nondiscriminatory reason for its action."  Fuhr, 710 F.3d at 674 (citing Spengler v.

Worthington Cylinders, 615 F.3d 481, 492 (6th Cir. 2010)) (internal quotation marks omitted). The County submits as its legitimate, nondiscriminatory reason Amos's failure to complete his personnel file in a satisfactory manner as well as his inability to do so, as the information received by the Sheriff's Department revealed that he did not qualify for a corrections officer position under Tennessee law.

"If a defendant successfully produces . . . a legitimate reason, then the burden of production returns to the plaintiff to demonstrate by a preponderance of the evidence that the proffered reason was a mere pretext for discrimination." Id. at 675. "[A] plaintiff can show pretext in three interrelated ways: (1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate the employer's action, or (3) that they were insufficient to motivate the employer's action." Tingle v. Arbors at Hilliard, 692 F.3d 523, 530 (6th Cir. 2012). These categories are, however, nothing "more than a convenient way of marshaling evidence and focusing it on the ultimate inquiry: did the employer fire the employee for the stated reason or not?" Id. (internal quotation marks omitted). "[A]t bottom the question is always whether the employer made up its stated reason to conceal intentional retaliation." Id. (internal alteration omitted).

Buck testified in his deposition that, in performing the TLO.com background checks, he discovered Amos had an outstanding arrest warrant for false imprisonment and trespassing in Phoenix, Arizona and that his discharge from the United States Air Force was under less than honorable conditions. (D.E. 126-2 at 15-16.) Consequently, he determined, Amos did not satisfy the requirements of § 41-4-144(a)(4)-(5). (Id. at 26-27.)

The sheriff stated that his interpretation of § 41-4-144 was that a discharge "under honorable conditions," as Amos's was, was not the same as an "honorable" discharge. (Id.) According to the

document, the reason for his separation from the military was "unsatisfactory performance." (D.E. 131-7.) Buck's reading of the Tennessee statute was, he claimed, confirmed by the local Veterans Affairs agent. (D.E. 126-2 at 27.) He also related that the documents received from the Phoenix Municipal Court indicated that the outstanding Arizona charges arose from an act of domestic violence and, thus, in his view, precluded Amos's employment. (Id. at 27-28.) He based this belief on a notation on the state complaint that victim rights notice was provided and that the case was eligible for domestic violence diversion. (Id. at 28, D.E. 131-5 at 5.) Strickland testified that he also believed Amos's discharge did not meet state requirements based on his reading of the Tennessee Corrections Institute's book of standards. (D.E. 127-6 at 13-16.)

Amos recalled that he believed until he was terminated that the Arizona case, which arose from an argument with the mother of his daughter, had been completed and, when he became aware it had not, he began working to have the case closed. (D.E. 126 at 7.) He contacted Phoenix authorities and was advised he needed to pay a fine and show he had completed counseling as required by the court. (Id. at 6-7.) He stated that he provided the necessary materials to the Phoenix court some three months prior to his deposition, which occurred in May 2013. (Id. at 1, 7.) Amos acknowledged that he "never presented to [the County] any type of documentation concerning completion of any case or counseling while [he was] in Arizona." (Id. at 7.)

With respect to his military discharge, Amos recalled that he was asked by a County representative whether he could get the discharge changed from "under honorable conditions" to "honorable." (Id.) He responded that, in his view, the two meant the same thing. (Id.) Nonetheless, he went to the local Veterans Affairs agent, who forwarded an application to the military to have his discharge upgraded to "honorable." (Id. at 9-12.) The request was refused, although the reason for

the refusal is unclear from the record.  (Id.)

Thus, it is undisputed that Amos did not provide the documentation requested by his employer.[15]  In response to the motion for summary judgment, however, he argues that he was not in fact required to do so.  First, he maintains that the Arizona matter did not involve "force, violence, theft, dishonesty, gambling, liquor, controlled substances or controlled substance analogues" as referred to in the Tennessee statute.  A review of the documents sent to Buck by the Phoenix Municipal Court reveals that, although Amos was charged with "knowingly restrain[ing] another person" (D.E. 131-5 at 6), there was no specific allegation or charge that the incident involved force or violence.

Further, the Plaintiff has submitted to the Court excerpts from the Civil Service Retirement System and Federal Employee Retirement System Handbook, which provides that "[h]onorable military service means service that was terminated under honorable conditions."  (D.E. 125-4 at 1.)  In addition, the handbook lists the types of separations from military service that are "honorable," including those "under honorable conditions."  (Id. at 2.)  While there is no evidence Buck consulted this publication, it was readily available.

The Court finds that the Plaintiff has produced sufficient evidence to establish a genuine issue of material fact as to whether the County fired Amos for an impermissible reason.  Consequently, summary judgment on the retaliation claim is not appropriate.

State Law Claim.

The Plaintiff's TPPA claim deals with the prisoner beating at the jail.  He maintains that, on

---

[15]Indeed, an EEOC investigator noted this fact in a handwritten postscript at the bottom of intake interview notes dated July 5, 2011, stating that Amos's failure to provide the requested information to his employer "may counter retaliation."  (D.E. 129-1.)

April 29, 2011, prisoner James McKinney was beaten by a Selmer, Tennessee police officer as he was being placed in the McNairy County Jail. Amos related in his deposition that he saw the Selmer officer grab McKinney and push his head forward while he was being booked. (D.E. 126 at 44.) The officer had the duty to turn McKinney over to Amos for booking into the McNairy County Jail, but Amos did not initially accept custody of the prisoner because he did not find him to be in proper condition for booking, as he was complaining of shoulder and head pain. (Id. at 44-49.) He discussed the matter with Steve Ellsworth, a senior deputy, who advised him to keep an eye on the prisoner and call someone if his condition worsened. (Id.) Amos later booked McKinney into the jail and called a superior to advise that he had one who needed to go to the hospital. (Id. at 48.) Plaintiff's partner, Janice Woods, made a notation of the request in the jail's logbook. (Id.) McKinney was transported to the hospital. Amos was interviewed in early May 2011 by state and/or federal investigators about the incident at Buck's request. (Id. at 50-51; D.E. 141 at 7.)

The TPPA provides that "[n]o employee shall be discharged or terminated solely for refusing to participate in, or for refusing to remain silent about, illegal activities." Tenn. Code Ann. § 50-1-304(b). In order to establish a prima facie case under the TPPA, a plaintiff must show

> (1) [his] status as an employee of defendant; (2) [his] refusal to participate in, or to remain silent about, illegal activities; (3) the employer's discharge of the employee; and (4) an exclusive causal relationship between the plaintiff's refusal to participate in or remain silent about illegal activities and the employer's termination of the employee.

Hugo v. Millenium Labs., Inc., No. 3:12-CV-167-TAV-HBG, 2014 WL 37659, at *7 (E.D. Tenn. Jan. 6, 2014). Upon making the necessary prima facie showing, the court is to utilize the McDonnell Douglas burden-shifting analysis. Levan v. Sears, Roebuck & Co., ___ F. Supp. 2d ___, 2013 WL 6181815, at *13 (E.D. Tenn. Nov. 25, 2013).

The first and third elements of the prima facie case have been shown. At issue are the second and fourth elements. With respect to the second, "illegal activities" are defined under the statute as "activities that are in violation of the criminal or civil code of [Tennessee] or the United States or any regulation intended to protect the public health, safety or welfare." Tenn. Code Ann. § 50-1-304(a)(3). A plaintiff must "show that he actually reported the alleged wrongdoing to someone other than his employer." Hugo, 2014 WL 37659, at *9.

The Plaintiff has pointed to no code or regulatory violation by the County regarding the McKinney incident. In his deposition, Amos identified the "illegal activity" as Ellsworth's "disrespect" of his request to send McKinney to the emergency room.[16] (D.E. 126 at 52.) He complained about the alleged slight to Ellsworth and to his partner. (Id. at 53, 55.) In his responsive brief, the "illegal activity" is described as his belief, and statement to investigators, that the County delayed seeking medical attention for McKinney.

According to the log book, McKinney was brought into the jail facility at 1:15 a.m. on April 29, 2011. (D.E. 132 at 6.) The same documentary evidence reflects that Amos called a superior at 2:20 a.m. to advise that McKinney was complaining of pain. (Id. at 7.) Plaintiff was instructed to arrange for transport to the hospital, which occurred at approximately 2:40 a.m. (Id.) Plaintiff argues in his brief that "[i]t is believed that when Amos finally convinced County officials to take this prisoner for medical help, that the delay caused the man even more serious injuries and even threatened the prisoner's life," citing McKinney's complaint in case no. 12-1101 filed in this district

---

[16]He also stated in his deposition that he believed officers were being made to "take comp time for overtime rather than being paid." (D.E. 126 at 54.) This "illegal activity" was not mentioned in Plaintiff's responsive brief and, therefore, the Court assumes he has chosen not to pursue a claim regarding this assertion.

on April 27, 2012 against, among others, McNairy County and the McNairy County Sheriff's Department. (D.E. 120 at 30.) However, in his forty-nine page complaint, McKinney never refers to a delay in treatment or alleges that the hour-and-a-half that elapsed between his arrival at the McNairy County Jail and his transport to the hospital caused him injury.

Moreover, Amos avers that he "honestly reported to the [Tennessee Bureau of Investigation (TBI)] that the County delayed in seeking medical attention for a prisoner who had been beaten by a Selmer police officer while at the County jail." (Id. at 31.) However, it is undisputed that he did not initiate a report to the TBI or anyone else outside the Sheriff's Department. Buck notified the district attorney's office, who brought in state and federal authorities to conduct an investigation of the incident. (D.E. 126-2 at 36-37.) The sheriff made Amos available for interview at the TBI's request. (D.E. 120 at 50, D.E. 126-2 at 56.) Amos does not dispute the declaration statement of Buck that he was neither encouraged nor influenced to refrain from providing information to state or federal investigative agencies. (D.E. 65-3 ¶ 16.) Plaintiff conceded in his deposition that Buck was not in the room during his statement and made no effort to interfere therewith. (D.E. 126 at 51.) Although he makes conclusory assertions to that effect in his responsive brief, Amos has pointed to nothing in the record indicating that he even told investigators that the County delayed taking McKinney to the hospital. In short, Plaintiff "was not faced with the moral dilemma of being forced to choose between keeping his job or reporting illegal activities." See Hugo, 2014 WL 37659, at *9. The TPPA claim is DISMISSED for failure to establish a prima facie case.

## CONCLUSION

In sum, the Defendant's motion for summary judgment is DENIED as to the retaliation claim and GRANTED as to the remainder.

IT IS SO ORDERED this 28th day of January 2014.

s/ J. DANIEL BREEN
CHIEF UNITED STATES DISTRICT JUDGE